## Case No. 16,248a.

### UNITED STATES v. SEELEY.

[2 Betts, C. C. MS. 58.]

Circuit Court, S. D. New York. Jan. 15, 1844.

OBSTRUCTING JUSTICE—CONTEMPTS—CONSTRUCTION OF STATUTE—TAKING AWAY AN ATTACHED VESSEL.

[1. The taking away of a vessel by her owner, after she has been attached by the marshal, but while she is not in the actual custody of himself or a keeper, does not constitute the offence of impeding or obstructing justice. within the meaning of the second section of the act of March 2, 1831 (4 Stat. 487), entitled "An act declaratory of the law concerning contempts of court."]

[2. It seems that the act was not intended to create any new offences, but is limited to cases which were recognized as contempts under the pre-existing law. and that the second section relates to those cases known as "constructive contempts."]

[3. But even if it were intended to create a new offence, unknown to the common law, yet in construing the statute the common-law meaning of the terms employed is to be observed.]

[4. The expressions "obstruct" and "impede" the due administration of justice, as used in the act, refer only to direct acts of violence or menace, disturbing the ordinary functions of the court.]

[Indictment of Albert Seeley and others for obstructing and impeding the due administration of justice, contrary to the act of March 2, 1831.]

BETTS, District Judge. The defendant, together with three other persons, was indicted under the 2d section of the act of congress entitled "An act declaratory of the law concerning contempts of court." The section provides that, if any person or persons shall corruptly, or by threats or force, endeavor to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall corruptly, or by threats or force, obstruct or impede, or endeavor to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor by indictment, and shall, on conviction thereof, be punished by fine not exceeding $500, or by imprisonment not exceeding three months, or both, according to the nature and aggravation of the offence. The first count in the indictment alleges, in substance, that a suit in rem was instituted on the side of the district court of this district, and that an attachment was duly issued therein, on which the brig Joseph Gorham, her tackle, &c., was arrested on the 4th day of August last, by a deputy of the marshal, the brig then lying and being at Brooklyn, &c., and that on the 7th day of August, whilst the brig was in the custody of the said deputy marshal under such attachment, the defendants, well knowing the premises, but corruptly devising and intending to obstruct and impede the due administration of justice, with force and arms, corruptly and by threats and force, did remove, take, and carry away the said brig, out of the custody of the deputy marshal, and thereby, there and then, corruptly, and by threats and force, did obstruct and impede the due administration of justice in the said district court, &c. The second count setting forth the same inducement, charges the offence, that the defendants, well knowing the premises, but corruptly devising (as before stated), corruptly did take and remove, and thereby then and there did corruptly impede the due administration of justice in a court of the United States. The third count charges that the vessel was removed by the defendants by force and arms, corruptly and against the will and consent of the deputy marshal, and thereby, they did, by threats and force, obstruct and impede the due administration of justice, &c. The remaining three counts set forth acts of the defendants to the same effect, with some variation of averments, so as in that mode to charge a substantive offence against such provision of the statute. To this indictment Albert Seeley demurred and the district attorney joined in the demurrer.

The indictment does not aver that the defendant by force or threats impeded, or endeavored to impede, the due administration of justice, raising thereby an issue open to any species of pertinent proof; but it sets forth specifically the acts done by him, and charges that by those acts he impeded, or endeavored to impede, justice, &c. It becomes then wholly a question of law, whether the acts alleged to have been committed are, of themselves, competent proof of the illegal intent and obstruction of justice, charged by the indictment. First, there is no allegation that the marshal was dispossessed of the property attached, either by force or threats, or was in any way hindered in the execution of his process or the custody of the vessel. It not being charged that the defendants deprived him of the actual custody of the vessel, it must be intended that he had no other than a legal custody, resulting from the due service of an attachment, and that the interference of the defendants consisted in removing the property so circumstanced, and with intent to defeat the arrest. This is also the extent of the intimidation or impeding of the marshal in the discharge of his duty, supposed to be inferable from the facts stated. It must accordingly be accepted, upon this indictment, that nothing was done by the defendants directly operating upon the officer, or the court, to obstruct or impede the due administration of justice; and the argument for the United States to uphold the prosecution is, that the action of the court being in rem, the removal of the res, whilst it was subject to that action, though at the time found derelict, as it avers, brings the parties so proceeding within the spirit and intent of the statute, and subjects them to conviction for a criminal offence.

As the levy of process on property places the property under the legal possession of the officer, and in custody of the court or the law, the deduction is that a wrongful interference with the property so situated, for the purpose of taking it from such custody, becomes a misdemeanor under this act, the same as if the vessel was rescued forcibly or tortiously.

To determine the just scope and application of the statute, it must first be considered whether it is intended to act only on what the law recognized as contempts of court. If its meaning is to be so restricted, then the acts charged against the defendants, however injurious to the administration of justice, would not be subject to indictment, without it is clearly established that they would have been punishable as contempts under the law as it stood previous to this enactment. The act assumes, in taking its name and title, to be a law concerning contempts of court. The first section very carefully defines and limits the power of the United States courts to issue attachment and inflict summary punishments for contempts of court. The second section subjects parties to indictment for impeding, or endeavoring to impede or obstruct, justice in certain methods; and for the defendant it is urged that congress only designed to modify or change the mode of punishment, and that it is still necessary to show that the matter

charged as an offence would have been a contempt, and punishable as such, but for the statute.

It is argued for the United States that the second section introduces a new class of substantive offences, and which are to be proceeded against without respect to any construction or remedy the courts might have given in regard to them, independent of the statute.

I am inclined to the opinion that the sound construction of the act would limit the second section to those cases which were recognized by the law as constructive contempts of court. The title is a very significant index to the intent of congress, and, without resorting to the special history of the period which induced the interference of the legislature [Preston v. Browder] 1 Wheat. [14 U. S.] 116, the ordinary principles of interpretation would leave courts to hold that both parts of an act so designated are in pari materia, and subject to like rules of construction. This inference is fortified by the consideration that congress had already provided punishments for offences in hinderance of justice, and if this statute designed to constitute the malfeasances therein referred to, of the same class, it would seem that an equal punishment would be prescribed. Whilst the offences of hindering justice may be punished by imprisonment for a year (2 Laws U. S. 97, §§ 22, 23), the misdemeanants under the act are subjected to imprisonment not exceeding 30 days, and the same grade of punishment they would have received if proceeded against summarily as contempts. Those indirect or consequential contempts, not committed in presence of the court or its officers, by suitors, jurors, &c., and subject to be punished by fine and imprisonment, are enumerated by Blackstone, and comprehend the description of cases designated in this second section of the act of congress. 4 Bl. Comm. 284–286; 3 Burrows, 1564; 1 Wils. 75; 6 Davis, Abr. 528; 7 Davis, Abr. 307–312. The impeachment of Judge Peck, and the trial that ensued, developed before congress the doctrine of courts of all orders of jurisdiction, in respect to contempts, and the usages of the United States courts in taking cognizance of them under the judiciary act of September 24, 1789 [1 Stat. 73]. The final judgment of the court of impeachment was rendered July 31, 1831, (Peck's Trial, 474), and this act was reported by the judiciary committee of ——, on the ——, as finally passed March 2, 1831.

This statute may have been designed to sustain the doctrine of the house of representatives advanced by their managers on that trial, that the power to punish contempts was of common-law origin, and belonged to the body of criminal jurisdiction of common-law courts, but its construction, alike upon its terms, and with a view to the history of the terms, most naturally applies its provisions to those matters theretofore regarded as within the summary jurisdiction of courts, and punishable by them as contempts. It designates, with marked precision, the boundaries of that authority to be thereafter observed, and then subjects to the jurisdiction of criminal courts those acts which may incidentally or consequentially interfere with the due administration of justice, but not falling within the limits of that summary jurisdiction as so defined.

Admitting, then, that the second section of the act embraces all cases of contempt tending to obstruct or impede the due administration of justice, the question arises whether the removal of property on which an attachment or execution had been levied amounts to such contempt, when the property taken was not found in the actual custody of the officer. A rescue of a party or property under arrest will be punished as a contempt (5 Vin. Abr. "Contempt," p. 443, art. 9), for then the process and authority of the court is opposed by violence, but no such violence accompanies the removal of property which the officer, after arrest, leaves without a keeper, and will the law imply that such taking is by force or threats, or in opposition to the authority of the court? At common law there can be no rescue but where the officer has the actual possession of the person or property (Co. Litt. 160; Fitzh. Nat. Brev. 226; 1 Hale, P. C. 606); and though more appropriately the proceeding by attachment in case of rescue is in protection of arrests of the person on mesne process (Hetl. 145; 2 Dana, Abr. 352), yet in cases of high treason or felony the king's bench will attach for contempt for rescuing a prisoner in execution (Co. Litt. 161; Co. Ent. 614). But it is not a rescue for a stranger to take goods seized by a sheriff on fi. fa. (Litt. 296; Sheriff of Surrey v. Alderton, Het. 145; Cro. Eliz. 639; 2 Sandf. 343–411); and the supreme court of this state refused an attachment against the defendant himself, for taking his property levied on forcibly from the sheriff (People v. Church, 2 Wend. 262).

If, then, the statute is to be understood as substituting a prosecution by indictment only in cases before subject to attachment as for contempts, it would seem clear, upon authority and principle, that the matter charged against the defendant could not have been cognizable by the court as a contempt previous to the act, and cannot accordingly be the foundation for an indictment under the act. But if the statute is to be construed as creating a new offence, and bringing acts for which the law before had supplied no remedy in the courts of the United States, within the criminal jurisdiction of those courts, it becomes necessary to consider whether the allegations of the indictment describe the offence designated by the statute.

It has been already observed that the gist of the indictment is, that the defendant took

away, with force and arms, out of the jurisdiction of the district court, a vessel arrested by warrant of attachment in a civil suit, in that court. It is not charged that any officer or keeper was dispossessed of the property, or that threats, intimidation, or force was applied to any officer having custody of the property for the purpose of taking it away. The indictment alleges that the defendant did the act corruptly, but the corruption is not averred to have any relation to any third person, and must accordingly be understood only as his own purpose of heart.

If the prosecution can be supported upon the facts set forth, it must be on the ground that it is a criminal offence for a person to take away property, his own or that of a third person, being under seizure by process of law, though after the arrest the property is left in the same situation in which it was arrested, and without any officer or other depository for him holding it in keeping.

The allegation that the transportation was with force and arms is mere surplusage, unless there was an actual or constructive force applied to dispossess the arrest of the officer or impede justice (1 Chit. Cr. Law, 198); and the averment is particularly inefficacious here, because the facts constituting the crime are all set forth, and no force, violence, or threats in respect to any third person is alleged to have accompanied them. It may have been technically a trespass, but higher force is requisite to subject the act to an indictment, unless accompanied by circumstances, constituting a breach of the peace. 4 Bl. Comm. 148; 3 Burrows, 1731; Russ. Crimes. 70. Do then the facts spread out upon the indictment constitute the offence of obstructing or impeding, or endeavoring to obstruct or impede, the due administration of justice, corruptly, or by threats or force?

Obstructing or hindering justice is a common-law offence, and was, as to various modes of committing it, one already provided against by the crimes act of 1790 [1 Stat. 112]. And if the act of 1831 creates in this particular an offence unknown to the common law, yet, in construing it, the common-law meaning of the terms employed is to be observed and applied to the act. 6 Dane, Abr. p. 598, art. 12. "Obstructing or impeding the due administration of justice" would be of the same character of offence as obstructing or opposing an officer in serving, or attempting to serve, process, and the act constituting either such obstruction or holding should accordingly exhibit the like constituents in both cases. The act or endeavor in the latter instance would necessarily apply to a different state of the proceedings in a suit, but would be comprehended in the general common-law description of the offence of obstructing or hindering justice. 2 Hale, P. C. c. 17, § 1; 4 Bl. Comm. 129; 1 Russ. Crimes, 519. To "obstruct," independ-

ent of the acceptation the word has obtained in the criminal law, would seem to stand ex vi termini a direct and positive interposition, which prevented, or tended to prevent, the action of the officer or court in respect to a matter then to be proceeded in. "Impede" must necessarily bear a similar import, and, if there be any discrimination between the two terms, it can only be that the same direct and positive interference may, without amounting to a complete obstruction, become an impediment to the action intended to be intercepted. The intention of the legislature to give these terms an application only to direct acts of violence or menace disturbing the ordinary functions of courts is inferrible from the construction that the endeavor is made equally criminal with the entire completion of the purpose. An endeavor to obstruct or impede, &c., by threats or force, would necessarily imply the effort to put forth some act, which in its natural, if not necessary, consequence, must be attended with an obstruction, and with a forced and compelled, interruption of further progress in the administration of justice. The indictment would seem to assume that any act of trespass connected with a subject-matter in litigation, which may lead to delay in such litigation, is an offence within this statute. The legislature could hardly be supposed to have intended to cover a ground so broad as that. Mere delay or procrastination of a suit, though produced wrongfully or by superior force, could not necessarily become an offence, affecting public justice. A replevy of property under levy; an arrest and imprisonment of the libellant in an action for an illegal seizure or levy of the property in question; or if a quarrel had arisen between the parties in respect to the arrest, and the defendant had beaten the libellant to the degree that he was disabled from attending to and prosecuting his action, these and other instances that might be put would each delay the case, and in that sense impede the immediate administration of justice; but they are not regarded at common law as the offence of hindering justice, nor is there any reason for holding that the language of this should be so extended as to embrace them. The evils in view of the legislature were acts of violence, or improper and corrupt dealings with the officers and ministers of justice, parties, or the process of the law. This is plainly shown by the first section of the act, and the second, in calling in the aid of the criminal court, ought to be understood to refer to that tribunal the cognizance of offences of like quality and bearing, and the remedy should not to be construed to depart entirely from and outrun the evil intended to be punished and expressed. Again, the indictment fails to show that the due administration of justice has been any way obstructed or impeded. The libellant attached the vessel by a proceeding in rem; but that arrest imparted no

title or right to the thing other than to have the value of the vessel applied towards the satisfaction of a decree, should one be rendered in his favor, provided the vessel was in law responsible for that demand.

The due administration of justice, on the demand of the libellant, if his right is sustained in court, is not necessarily the condemnation of the vessel; it is only the adjudication and settlement of his right, and as consequent satisfaction of the demand decreed in his favor out of the property seized. The primary question is his right to a decree of damages, and, secondary to that, is that of his right to, or the necessity for, a remedy against the vessel; and it cannot be asserted that the administration of justice is any way affected by the removal or destruction of the thing arrested, without it is made palpable that the specific thing would be subjected to, and was required for, the satisfaction of this demand, and that this consequential decree was a constituent and essential part of the procedure in administering the justice of the case. Further, if this arrest was valid and the vessel was legally responsible in the action, then his remedy is perfect against the marshal because of an insufficient execution of the process. Had the proceeding been in personam, and the respondent after arrest, and before giving bail on stipulation, had been persuaded or forcibly abducted out of the district of the defendant, such act could not have been criminally prosecuted under this statute, because justice is administered upon the right of such libellant just as duly by enforcing satisfaction out of the officer, or out of bail, as from the defendant or his property. To obstruct or impede the due administration of justice upon the ordinary signification of language must be something further than pleading embarrassment or difficulties in the way of a convenient enjoyment of the fruits of a litigation. A trespass or waste committed by one party upon property under litigation would render the property less valuable to his antagonist should it be awarded him, and, in so far as the due administration of justice requires that the entire benefit adjudged a party should be secured him, would to that extent obstruct and impede such administration; and upon like principle any spoliation of part of the tackle or furniture, or destruction of any part or appurtenance of this vessel, by the defendant, would be a criminal offence. But it must be manifest that such remote and contingent consequences, to acts not otherwise criminal, could not be intended by congress to be embraced within the scope of this section, if it is understood as introducing a class of criminal misdemeanors before unknown to the law.

It would seem palpable that the administration of justice which the act intended to defend and protect from being obstructed or impeded consists of that action of the courts, through their officers and other direct instrumentality, essential to the free and full consideration and determination of the matter, and the enforcement of their orders and decisions. To this extent the community has a common concern. The public is deeply interested in maintaining without disturbance, for the court, their officers, processes, and the parties litigant before them; the powers and privileges by means of which questions of right and wrong are investigated and settled. But when the law has by its penal sanctions protected against molestation the action of these agencies, so far as they are direct and necessary to this common good, it may well be supposed that the accidental disturbances or procrastinations an individual may encounter, in realizing the fruits of his success, and which, in their nature, are personal to himself alone, would be left to be redressed by that mode of remedy the law furnishes for particular torts and injuries. But, again, the due administration of justice does not necessarily import that its course must always be expeditious or direct. If by the removal of this property the remedy of the libellant has been less prompt and immediate, his relief is still within the competency of the court by its ordinary course of proceeding. The more circuitous and dilatory method of redress would be the due administration of justice, as much as the most summary and peremptory; and changing the course of the court from one method of remedy to the other, both in the end being the same, would not be obstructing or impeding justice.

If it be conceded that the due administration of justice in behalf of a party who obtains judgment or decree for damages requires that those damages should be satisfied to him, such administration is not necessarily obstructed or impeded because the party fails obtaining the satisfaction in one mode, if it be equally secure to him in another; and it would therefore be necessary in the indictment in this case to charge that, by means of the wrongful removal of the vessel, the libellant was deprived of all remedy for his demand, because if thereby the marshal has become responsible to him for his damages, or he can have direct satisfaction by decree against the respondent, the administration of justice in his behalf is in no way defeated or obstructed by depriving him of recourse against the vessel. The offence is not put upon this ground by the indictment. The subject is susceptible of much more extended illustration, but the discussion has been sufficiently minute to indicate the opinion of the court, that the facts set forth upon this indictment do not constitute a criminal offence, within the meaning of the second section of the act of March 2, 1831, and judgment is therefore pronounced in favor of the demurrer and against the indictment.